# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 05-427

PAT DOLAND D/B/A PAT'S OF CAMERON

VERSUS

ACM GAMING COMPANY

**********

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 10-14763
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and J. David Painter, Judges.

EXCEPTION OF NO RIGHT OF ACTION OVERRULED; JUDGMENT AFFIRMED.

John Emory Seago
SEAGO & CARMICHAEL
8126 One Calais Avenue - Suite 2-C
Baton Rouge, LA 70809
Telephone: (225) 766-5805
COUNSEL FOR:
    Defendant/Appellant - ACM Gaming Company

Penelope Quinn Richard
132 Smith Circle
P. O. Drawer 579
Cameron, LA 70631
Telephone: (337) 775-8131
COUNSEL FOR:
    Plaintiff/Appellee - Pat Doland d/b/a Pat's of Cameron

**Jack Warner Riffle**
**Fenet Law Firm**
**8641 United Plaza Boulevard - #200**
**Baton Rouge, LA 70809**
**Telephone:  (225) 926-5500**
**COUNSEL FOR:**
     **Defendant/Appellant - ACM Gaming Company**

THIBODEAUX, Chief Judge.

Pat Doland, d/b/a Pat's of Cameron (Doland), sued ACM Gaming Company (ACM) for violations of Louisiana's Unfair Trade Practices and Consumer Protection Law (Unfair Trade Practices Law). After a bench trial, the trial court rendered judgment in favor of Doland and against ACM. ACM has appealed the judgment and has also filed an exception of no right of action with this court, challenging Doland's standing to recover the damages claimed. For the following reasons, we overrule the exception of no right of action and affirm the judgment of the trial court.

## ISSUES

ACM, through its exception of no right of action, asks whether "Pat Doland, d/b/a Pat's of Cameron" possesses the legal capacity to sue to recover the damages asserted in the lawsuit or whether the right to recover those damages belongs solely to the entity "Pat's Restaurant of Cameron, Inc."

On appeal, ACM asks this court to determine whether it violated Louisiana's Unfair Trade Practice and Consumer Protection Law by refusing to remove its video poker machines from the premises of the restaurant, despite its belief that a *bona fide* dispute existed regarding whether the machines could remain on the premises under the existing lease terms. Regarding damages, ACM asks this court to determine whether Doland failed to mitigate his losses when he caused the video poker machines to be disabled prior to the resolution of the lease dispute, thereby limiting his recovery of the damages claimed. Finally, we are asked to review whether Doland proved with reasonable certainty the damages that were awarded by the court.

**FACTS AND PROCEDURAL BACKGROUND**

At the center of this dispute is a lease agreement between Allied Gaming Management, Inc. (Allied), its assignee, ACM, and Pat's of Cameron. Pat's of Cameron is a restaurant located in Cameron, Louisiana, which is owned and operated by Pat Doland. Allied leased space in the restaurant for the exclusive installation and operation of video poker machines. The lease was entered into on July 19, 1993, for an initial term of three (3) years, ending July 19, 1996. A representative of Allied signed the contract on its behalf. Doland signed his name on the signature line that was generically designated for the lessor.

According to the lease, either party could cancel it after the initial three (3) year term if, within sixty (60) days of the end of the term, written notification of the cancellation was sent to the other party by certified mail. It is undisputed that Doland issued timely notice of his intent to discontinue the lease by letter dated December 8, 1995. Although the lease period ended on July 19, 1996, Allied did not remove the video poker machines. Rather, Allied continued to remit to Doland his share of revenues from the machines. Doland testified that because he was continuing to receive those payments, he decided to allow the machines to remain on the premises on a day-to-day basis until he was able to purchase machines to replace them. He made a handwritten notation on the bottom of the original lease agreement sometime after July 19, 1996, which states, "[p]lease Note: We have agreed to continue with these people until we get our license to buy our own machines."

A year later in August of 1997, Doland learned that Allied had filed for Chapter 11 bankruptcy in 1995 and that its assets had been recently purchased by ACM as a part of a bankruptcy reorganization plan. Allied's July 19, 1993 lease agreement with Doland was included in the asset purchase. After learning of the

purported lease assignment to ACM, Doland orally advised at least two employees of ACM that the lease it had assumed terminated in 1996 and that the machines were onsite only on a day-to-day basis. ACM advised that it believed that the lease had been reconducted by Doland's consent to allow the machines to remain onsite after July 19, 1996, and his continued acceptance of gaming revenue. Doland disagreed and demanded removal of the video poker machines. ACM refused and argued that it was not required to remove the machines until such time as Doland gained his own gaming operator's license, as set forth in the terms of the current lease.

Doland's attorney sent a demand letter to ACM on August 11, 1997, requesting removal of the machines within five (5) days of its receipt of the letter *in lieu* of the institution of legal proceedings. When ACM failed to comply, Doland contacted the Louisiana State Police and requested that the machines be disabled, believing that ACM would be forced to remove the machines as a result. The machines were disabled by the state police on August 27, 1997, but ACM continued to refuse to remove the machines. Consequently, on October 1, 1997, "Pat Doland, d/b/a Pat's of Cameron" filed a "Petition for Damages and Injunctive Relief" in the district court against ACM. A preliminary injunction hearing was held on November 10, 1997, resulting in the issuance of an order by the trial court to ACM to remove its machines within forty-eight (48) hours of the hearing. There is conflicting testimony as to which day the machines were actually removed, but it is undisputed that they were not removed within the forty-eight (48) hours ordered by the court.

Doland contends that during the time period in which he had no working video poker machines at his establishment, he lost patrons and suffered losses in restaurant sales and video gaming revenue. He testified that as long as ACM's machines remained at his restaurant, the state police prohibited him from connecting

3

any additional machines at that location. Doland contended that ACM had knowledge of the fact that he had negotiated a more favorable lease with another company for the placement of video poker machines at the restaurant and that ACM's refusal to remove its machines, even after they were disconnected, was meant to cause him losses and to prevent a competitor from operating machines at that location.

The trial court ruled in favor of "Pat Doland, d/b/a Pat's of Cameron," finding ACM's failure to remove the machines to have been a violation of Louisiana's Unfair Trade Practices and Consumer Protection Law. The court reasoned that the July 19, 1993 lease was timely terminated and that a new day-to-day lease was established after July 19, 1996. Because this new lease was indeterminate, according to the trial court, the video poker machines could remain onsite subject to Doland's will. As a result, the court found that the failure of ACM to remove the machines after receipt of multiple demands from Doland to do so, constituted "a coercive and unethical method to keep those machines on Mr. Doland's property when they no longer had any right to have the machines there." The court stated that Doland was, therefore, "entitled to the damages for their failure to enable him to buy his own machines or, as he ultimately did, to make a more favorable agreement with another company."

The trial court awarded Doland a total of $60,841.78, with legal interest from the date of judicial demand until paid, plus all court costs. The damage award consists of gaming revenue lost between August 27, 1997 and December 10, 1997, in the amount of $18,988.78.[1] Doland was also awarded lost revenue from restaurant sales incurred between August 27, 1997 and December 10, 1997, in the amount of

---

[1]These dates represent the ninety-one (91) days during which there was no video poker revenue generated at the restaurant.

$26,853.00. The total damage award also included general damages in the amount of $10,000.00 and attorneys' fees in the amount of $5,000.00.

ACM has responded to the judgment by filing an exception of no right of action with this court, challenging Doland's individual standing to file the underlying lawsuit, as well as filing an appeal, seeking review of the trial court's judgment.

## LAW AND ANALYSIS

### *Exception of No Right of Action*

The purpose of the exception of no right of action is to determine whether a particular plaintiff is within the general class of those to whom the law grants the cause of action being asserted in the suit. *See Crochet v. Cisco Sys., Inc.*, 02-1357 (La.App. 3 Cir. 5/28/03), 847 So.2d 253, *writ denied*, 03-1838 (La. 10/17/03), 855 So.2d 765. In other words, it is a device intended to terminate a suit that has been brought by a person who has no interest in judicially enforcing the right asserted. *Id.* This peremptory exception can be raised at any time, even on appeal, and, therefore, it is properly before this court. *Lambert v. Donald G. Lambert Constr. Co.*, 370 So.2d 1254 (La.1979).

ACM asserts that "Pat's Restaurant of Cameron, Inc." is the sole entity that owns the right to bring the action that was filed individually by Doland. It contends that the tax returns filed on behalf of "Pat's Restaurant of Cameron, Inc." are evidence of the corporation's ownership of the restaurant and its corresponding right to claim damages for the losses allegedly suffered by the business.

ACM bases its argument on the premise that generally, the right of action for loss to a corporation is an asset of the corporation and only lies with the corporation. *Glod v. Baker*, 02-988 (La.App. 3 Cir. 8/6/03), 851 So.2d 1255, *writ*

5

*denied*, 03-2482 (La. 11/26/03), 860 So.2d 1135. However, an issue is presented in this case because the original lease agreement with Allied does not reference the corporation, "Pat's Restaurant of Cameron, Inc." Instead, the lease's introductory clause states "[t]his lease made and entered into this 19<u>th</u> day of <u>July</u>, 199<u>3</u>, by and between Allied Gaming Management, Inc. as Lessee, and <u>Pat's Restaurant of Cameron</u>, DBA <u>Pat's Restaurant of Cameron</u>, <u>Cameron, LA</u>, [sic] Louisiana as Lessor, . . ." The lease was signed by Doland, individually, as "Pat Doland."

The issue of who possessed the right to bring underlying action against ACM is answered by determining the parties to the original lease. The third circuit confronted a similar situation in *Creaghan-Webre-Baker dba CWB v. Le*, 534 So.2d 94 (La.App. 3 Cir. 1988). In order to determine who possessed the right to bring the underlying action – the partnership, "Creaghan-Webre-Baker, dba CWB," or the individuals comprising the partnership – our court applied this same analysis. This court found that the partners signed the contract in their individual capacities and that, as a result, the partnership, CWB, did not possess the right to bring the pending action. *Id*. This was based on the fact that each person signed the contract in his or her own name and that there was no indication elsewhere in the contract that those individuals were acting as agents of the partnership. *Id*. Absent the clear establishment of an agency relationship between the individuals who signed the contract and the partnership, the argument that the individuals were contracting on behalf of the partnership was rejected. *Id*.

We similarly find that the lease agreement that is presently before us was entered into individually by Pat Doland. He signed the lease in his personal name, without any designation that he was acting on behalf of any other entity. In addition, we find it relevant that "Pat's Restaurant of Cameron, Inc." is a Chapter S

6

corporation. The owners of such qualifying entities are taxed as sole proprietors or partnerships and are personally liable for the losses and debts of such a corporation; the Chapter S corporation is not taxed. *See* 26 U.S.C.A. §§ 1363, 1366. Under Louisiana law, this corporation, therefore, is not a separate and distinct entity from the individual, Doland, and as a result, there exists no legal distinction between the individual and the business. *See Robinson v. Heard*, 01-1697 (La. 2/26/02), 809 So.2d 943.

Accordingly, we conclude that the right of ownership in the underlying action against ACM belonged to Doland. *See Creaghan-Webre-Baker*, 534 So.2d 94. His signature created a personal obligation, giving him the right to file the action at issue. *Id*. The exception of no right of action is overruled.

### *Violations of the Unfair Trade Practices and Consumer Protection Law*

ACM argues that the trial court erred when it found that its failure to remove the video poker machines from the restaurant constituted an unfair trade practice. According to ACM, when Doland allowed the video poker machines to remain in place after July 19, 1996, the lease was reconducted. It reasons that under the terms of this reconducted lease, it was not obligated to remove the machines from the premises until Doland obtained his own video gaming machines and operator's license. ACM concludes, therefore, that leaving the machines onsite was an act of lawfully enforcing its rights under the lease.

The Unfair Trade Practices Law states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." La.R.S. 51:1405(A). Jurisprudence has held that a practice is considered unfair, in the context of the unfair trade practices law, when it offends public policy and when the practice is unethical, oppressive,

unscrupulous, or substantially injurious to consumers or business competitors. *See Inka's S'Coolwear, Inc. v. Sch. Time, L.L.C.*, 97-2271 (La.App. 1 Cir. 11/6/98), 725 So.2d 496. The determination of what constitutes an unfair trade practice is fact-sensitive and, as such, can only be decided on a case-by-case basis. *See Vermilion Hosp., Inc. v. Patout*, 05-82 (La.App. 3 Cir. 6/8/05), 906 So.2d 688. Louisiana's unfair trade practices law gives a right of action to anyone who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as the result of an unfair trade practice and provides for the recovery of actual damages, including court costs and attorneys' fees. *See* La.R.S. 51:1409.

The manifest error standard of review applies to the review of such matters, preventing this court from disturbing the trial court's findings of fact and evaluations of credibility that have a reasonable basis in the evidence. *Rosell v. Esco*, 549 So.2d 840 (La.1989). Applying this standard, we find no manifest error in the trial court's ruling that ACM's actions constituted violations of the unfair trade practices law.

In reaching its conclusions, the trial court found that the original lease between Allied and Doland terminated on July 19, 1996. We agree. We also agree with the trial court that a new lease was created between ACM and Doland after July 19, 1996, and that the old lease was not reconducted. Louisiana Civil Code Article 2721 explains that reconduction of a lease occurs when, "after the expiration of the term, and without notice to vacate or terminate or other opposition by the lessor or the lessee, the lessee remains in possession" for a certain time period. In *Eames v. Goodwin*, 337 So.2d 909 (La.App. 3 Cir. 1976), this court explained that reconduction cannot occur when either party has taken action to terminate the lease prior to the end of the lease term. In *Eames*, we wrote that the lessor's notice to the

8

lessee of his intent to terminate the lease prior to the ending of the lease precluded reconduction of the lease, even though eviction proceedings were not instituted to ouster the lessee until approximately three (3) months later. *Id.* This court reasoned that reconduction "is not to be used to force a contract upon parties unwilling to contract, but merely to establish a rule of evidence, or a presumption, as to their intention when a contrary intent has not been expressed." *Eames*, 337 So.2d at 911 (citing *Ashton Realty Co., v. Prowell*, 115 So. 579 (La.1928)). Therefore, as the supreme court in *Ashton* has stated, the principle of reconduction "has no application whatever when either party has clearly announced his intention *not to renew* the lease . . . ." *Ashton*, 115 So. at 581. In this case, the record is clear that Doland expressed his intention to terminate the lease prior to the end of the term, thus precluding a reconduction of the original lease. *Eames*, 337 So.2d 909.

However, we find that trial court erred in ruling that the new lease, created after July 19, 1996, constituted a day-to-day lease. The new lease agreement did not have a set term or duration and, consequently, constituted an indeterminate lease, the term of which is automatically supplied by law. *See* La.Civ.Code arts. 2678, 2680. In regards to the lease of an immovable (floor space in the restaurant), which is at issue here, the lease term supplied by law is month-to-month. La.Civ.Code art. 2680(2). Accordingly, a month-to-month lease was in effect between ACM and Doland after July 19, 1996.

Notice of termination of a month-to-month lease is required to be given ten (10) calendar days before the end of the month in which termination is sought. La.Civ.Code arts. 2727, 2728(2). Also, when the leased thing is an immovable, the notice of termination must be given in writing. La.Civ.Code art. 2729. The record reflects that satisfactory written notice of termination was given on August 11, 1997,

9

to ACM by Doland's attorney, which was sufficient notice to terminate the lease at the end of that month. Accordingly, ACM should have vacated the property by the end of August, 1997.

Nevertheless, ACM persisted in its refusal to remove the video poker machines after receiving multiple written demands for their removal and despite the disabling of the machines by the state police. The trial court concluded that ACM's tactics were an unethical and unconscienable method used to coerce a small restaurant owner. It reasoned that ACM possessed the option to legally test the effectiveness of the lease that it contended was in place, rather than to leave the machines on Doland's property, which had the effect of barring anyone else from operating machines at that site. Accordingly, we find no merit to ACM's assertion that the trial judge erred in finding a violation of the Unfair Trade Practices Law.

### *Damages*

ACM contends that the damages awarded by the trial court should be reduced because Doland failed to mitigate his damages during this dispute. Specifically, ACM asserts that Doland's act of disabling the video poker machines through the state police prior to him gaining a judicial resolution of the lease dispute created self-imposed losses for which he should not be awarded damages. ACM also argues that Doland should not be allowed to recover damages for losses sustained between November 13, 1997 and December 10, 1997. ACM contends that it removed its video poker machines from the restaurant on November 13, 1997, and that any losses suffered by Doland between that date and December 10, 1997, the date he was able to replace those machines, were caused by Doland's own negligence in failing to get a new device owner in place more quickly. We find no merit to these arguments.

10

Although it is true that Louisiana law requires a person injured by the wrongful acts of another to mitigate his damages, the law does not impose a burden upon an injured party to make a particular choice between two available legal remedies. *Weber v. McMillan*, 285 So.2d 349 (La.App. 4 Cir. 1973), *writs denied*, 288 So.2d 357, 358 (La.1974). Rather, the doctrine requires the injured party to exercise reasonable diligence and ordinary care in attempting to minimize his damage. *Kent v. Cobb*, 35,663 (La.App. 2 Cir. 3/8/02), 811 So.2d 1206, *writ denied*, 02-1011 (La. 6/7/02), 818 So.2d 772. The care and diligence required of the injured party is the same as that which would be required by a person of ordinary prudence under like circumstances. *Id*. In other words, an injured party has a duty to mitigate only if it is reasonable to do so. *Id.* The burden rests with the wrongdoer to show that the injured party failed to mitigate damages. *Id*.

The record reflects that Doland first resorted to having ACM's video poker machines disabled by the state police. Shortly thereafter, he filed suit in an effort to gain removal of the machines from his premises. Doland's testimony reflects that he sought to have the machines disabled, believing that the state police would assist in having the machines forcibly removed within seventy-two (72) hours of them being disabled. It was only after the machines were disabled that he learned that the state police would not intervene in the physical removal of the machines. After determining that this action would not result in the removal of ACM's machines, Doland shortly thereafter filed suit to gain removal of the machines. The record is also clear that Doland had negotiated a lease agreement with a new vendor for the placement of video poker machines at his restaurant prior to him having ACM's machines disabled and prior to filing his lawsuit, but he could not move forward with having the machines placed at his restaurant until ACM's machines were removed.

11

Accordingly, we find that the efforts undertaken by Doland to have ACM's video poker machines removed were lawful and reasonable mitigation efforts. Doland's losses were actually caused by the unlawful actions of ACM. Doland was under no obligation to allow ACM's machines to remain operational at its restaurant until it gained a judicial resolution of the matter. Accordingly, we find that ACM has failed to carry its burden of establishing that Doland's acts were unreasonable and caused further damage for which he should not be compensated. *See Kent*, 811 So.2d 1206.

We further find that ACM has failed to establish that the time period of November 13, 1997 to December 10, 1997 should not have been included in the calculation of Doland's losses. Although ACM argues that it removed its machines from its premises on November 13, 1997, contradictory evidence is presented in the record regarding the actual date of removal of the video poker machines. In fact, the record reflects that an "Application for Video Poker Device Permit," detailing ACM's device transfer request was not processed by the Gaming Control Board until November 26, 1997. It was approximately two (2) weeks later that Pat's was able to have other video poker devices placed on his premises for operation. Accordingly, we find no manifest error in the trial court's inclusion of the time period of November 13, 1997 through December 10, 1997 in its calculation of losses suffered by Doland.

Finally, ACM asserts that the trial court's damage award should be reversed because Doland failed to establish damages to a reasonable certainty as required by law. In fashioning its damage award, the trial court relied on the testimony of Doland's CPA, Marie Prejean, and her calculations of loss of restaurant sales and loss of gaming revenue based on daily averages taken, respectively, from the prior year's tax records and state police reports. This testimony was uncontradicted during the trial. The amounts calculated by Prejean and accepted by

12

the trial court were not prohibited estimates of losses based on speculation or conjecture, but were values established by direct evidence. *See Smith v. Shirley*, 01-1249 (La.App. 3 Cir. 2/6/02), 815 So.2d 980, *writ denied*, 02-688 (La. 5/24/02), 816 So.2d 308. Accordingly, we find that Doland sufficiently proved his entitlement to these amounts of lost restaurant sales and gaming revenue.

## CONCLUSION

The "Exception of No Right of Action" is overruled and the judgment of the trial court is affirmed. Costs of this proceeding are assessed to defendant-appellant, ACM Gaming Company.

**EXCEPTION OF NO RIGHT OF ACTION OVERRULED; JUDGMENT AFFIRMED.**